**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES, | : | |
| | : | **CRIMINAL ACTION** |
| v. | : | |
| | : | **No. 06-719** |
| EDWARD KAPLAN, et al. | : | |

**<u>MEMORANDUM</u>**

**Schiller, J.**                                                      **November 13, 2009**

In a nine-count Second Superseding Indictment, the Government charges Defendants Edward

"Pooh" Kaplan and Leonard Mason with various drug offenses stemming from their alleged

participation in a large drug trafficking operation centered in Chester, Pennsylvania. During the

investigation into the drug ring, law enforcement received approval to search both real and personal

property and conduct wiretaps of cellular phones used by purported members of the drug ring.

Kaplan filed a motion to suppress the evidence against him obtained through six orders authorizing

wiretaps and through a search warrant allowing two properties and a vehicle to be searched. Mason

also seeks to suppress wiretap evidence and evidence obtained from a vehicle he was operating in

July of 2006.

Kaplan challenges the following: (1) an April 19, 2006 order authorizing a wiretap on a

prepaid cellular phone used by Kaplan; (2) an August 2, 2006 order authorizing a wiretap on another

cellular phone used by Kaplan; (3) orders of August 29, 2006 and September 27, 2006 authorizing

the continued interception of the cellular phone subject to the August 2, 2006 order; (4) orders of

August 14, 2006 and September 12, 2006 authorizing interception of a cellular phone used by

Kaplan; and (5) search warrants executed on November 22, 2006 that allowed police to search a third

floor apartment at 416 Chelten Avenue in Philadelphia, property at 122 West Wyneva Street in

Philadelphia, and a Nissan Maxima that Kaplan was using.

Mason challenges a June 22, 2006 order authorizing a wiretap of a cellular phone he used and a July 20, 2006 order authorizing the continued interception of the cellular phone subject to the June 22, 2006 order. Mason also seeks to suppress evidence seized based on a July 19, 2006 search warrant, which permitted officers to search a Chrysler Town & Country minivan Mason was driving when police pulled him over on Interstate 95 in Chester, Pennsylvania. For the reasons below, the Court denies Defendants' motions in their entirety.

## I.    WIRETAPS

Kaplan and Mason raise identical arguments for suppressing evidence obtained from wiretaps. First, they argue that the evidence must be suppressed because the orders authorizing the wiretaps were signed by a Pennsylvania Superior Court judge and such a judge is not authorized by federal law to sign such authorizations. Second, Kaplan and Mason argue that the Government lacked probable cause. Third, Defendants claim that the Government failed to show that electronic audio surveillance was necessary, as required by federal law.

### A.    Factual Background

#### 1.    *Kaplan*

The April 19, 2006 affidavit is the "core" affidavit – all subsequent wiretap applications challenged in Defendants' motion build upon and incorporate this affidavit. Accordingly, the Court will outline the information from this core affidavit, which totals close to 400 single-spaced pages.

##### a.    *Affiants' experience and qualifications*

The affidavits were attested to by Pennsylvania State Troopers Michael Skahill and Sean

Regan, both of whom have extensive experience and training in drug-related investigations. Trooper Skahill has successfully completed the Pennsylvania State Police twenty-five week basic training program and an extensive one-week Drug Investigators Course conducted by the Pennsylvania State Police. He teaches at the Top Gun Narcotics Investigators Course and has taught Drug Investigation classes at the Pennsylvania State Police Academy. He has been an affiant on twenty prior non-consensual electronic interceptions and has been qualified as an expert in the field of drugs and drug investigations. As a result of his training and experience, he is familiar with "the methods, devices, and modus operandi of persons and organizations that illegally distribute controlled substances." He is also familiar with techniques used to conceal drugs as well as lingo and slang used by those engaged in illegal drug activity. Trooper Regan has also successfully completed the Pennsylvania State Police twenty-six week training academy. He has attended a number of schools and training courses related to drug trafficking, concealment and identification. Over the course of his career, he has been involved in hundreds of narcotics investigations and has executed search warrants and made controlled purchases. Like Officer Skahill, he is familiar with techniques used to conceal drugs as well as lingo and slang used by those engaged in illegal drug activity.

b.    *Confidential informants*

In January of 2005, affiants interviewed a confidential informant, CI#1, who provided information about persons in Chester, Pennsylvania whom CI#1 knew to be involved in the illegal drug trade. One such person was Jamille Barksdale, from whom CI#1 purchased large amounts of cocaine. The informant also provided officers with a telephone number that CI#1 used to contact Barksdale. CI#1 further related that Burnie Majeed and Troy Cauthorn supplied Barksdale with

cocaine.[1] CI#1 also informed officers that Barksdale would meet with Majeed and Cauthorn every couple of weeks and was expected to pay them large sums of money for the cocaine. According to the affidavit, CI#1 previously provided the affiants reliable information that had been independently corroborated.

Trooper Skahill spoke with Officer David Tyler of the Chester City Police Department about Barksdale, Majeed and Cauthorn, and the drug trade in Chester. Officer Tyler reported that a reliable confidential informant, CI#2, mentioned Barksdale, Majeed, and Cauthorn as persons involved in the illegal drug trade; CI#2 had seen Majeed carrying large amounts of cocaine and conducting drug transactions. In fact, CI#2 reported that Majeed and Cauthorn are among the largest cocaine traffickers in Chester. CI#2 also reported that a number of persons reported buying cocaine from Barksdale and Cauthorn.

In February of 2005, Officers Skahill and Regan met with a third confidential informant, who provided them with information that they determined to be reliable, both through independent police investigation and through other sources of information. CI#3 told the officers about drug traffickers who had purchased cocaine from Cauthorn. He also stated that he saw Barksdale meet with Majeed prior to a meeting between CI#3 and Barksdale, during which Barksdale sold CI#3 nine ounces of cocaine.

Troopers Skahill and Regan also spoke with Officer Tyler regarding another confidential informant, CI#4, who described Barksdale, Majeed, and Cauthorn as known drug traffickers in

---

[1] The targets of the investigation, Barksdale, Majeed, and Cauthorn all have lengthy criminal records. Barksdale and Cauthorn have both pled guilty and served time for drug offenses and Majeed has been convicted of numerous drug offenses in different states. Majeed is believed to be "one of the largest drug traffickers in the Chester City and Delaware County areas."

Chester. Over a two-year period, CI#4 purchased cocaine from Barksdale, Majeed, and Cauthorn. CI#4 also had seen Cauthorn and Majeed in a home in New Jersey with a money counting machine and cash in excess of $100,000. According to the affidavit, CI#4 was unwilling to introduce an undercover officer to any of the drug traffickers and, out of safety concerns, was unwilling to help in the arrest of Barksdale, Majeed or Cauthorn.

In March of 2006, the officers spoke to another confidential informant, CI#5, who had, over the past few years, bought large quantities of cocaine directly from Barksdale and Cauthorn. CI#5 was aware of Majeed's drug trafficking activity from conversations with other drug traffickers, although CI#5 had not purchased cocaine directly from Majeed for several years.

In April of 2006, Trooper Skahill spoke with Officer Andy Rehr of the Philadelphia Police Department about Edward Kaplan and his suspected drug dealing in the Philadelphia area. Officer Rehr reported that he had received information from a reliable confidential informant, CI#6, that CI#6 had personally purchased kilogram quantities of cocaine from Kaplan, that CI#6 had seen Kaplan with large amounts of cocaine and that other drug traffickers informed CI#6 that they had purchased kilogram quantities of cocaine from Kaplan. CI#6 also reported that he saw Kaplan with an associate known as "Burn" and that he saw "Burn" driving a cream-colored or white BMW 745. The officers believed that "Burn" was Majeed, who had been known to drive a cream-colored or white BMW.

*c.      Controlled drug purchases*

The affiants additionally directed controlled purchases of cocaine from Barksdale. In January of 2005, CI#1 placed a recorded call to Barksdale in which CI#1 scheduled a meeting to purchase cocaine. The transaction occurred exactly as CI#1 informed the officers it would and CI#1 was able

5

to purchase over 123 grams of cocaine from Barksdale. Using the help of CI#1, officers set up another controlled purchase from Barksdale in April of 2005. Following the purchase of 122 grams of cocaine, CI#1 called Barksdale. During the call, Barksdale reported to CI#1 that he had noticed what he considered to be suspicious vehicles in the area during the transaction. Barksdale was correct; he had spotted surveillance vehicles. Shortly after this controlled purchase Barksdale told CI#1 that he was "laying low" for a period of time and that Barksdale would not be using the cell phone number he had previously provided to CI#1. However, Barksdale provided CI#1 with a new cell phone number. In June of 2005, under the supervision of law enforcement, CI#1 called Barksdale and inquired whether Barksdale has resumed his drug trafficking. Based on the conversation, CI#1 believed that Barksdale had resumed his illegal activities. According to CI#1, the best way to introduce an undercover officer to Barksdale would be in a social setting, but attempts to arrange such a meeting had proved unsuccessful. Nonetheless, additional controlled purchases from Barksdale were made on June 15, 2005 and November 4, 2005.

### d. Pen registers/DNR Trap and Trace devices

Throughout their investigation, law enforcement officials obtained orders for Pen Registers and DNR Trap and Trace Devices on Barksdale's cell phones, which allowed them to capture incoming and outgoing phone numbers as well as the duration of Barksdale's phone calls. Using these investigative techniques, officers noted a much higher number of incoming calls, which is typical of suppliers with established customers. Furthermore, the timing of the calls revealed that Barksdale received calls at all hours of the day and night but made few calls in the early morning. According to Troopers Skahill and Regan, "traffickers of controlled substances will receive calls at all hours of the day, but as a rule of thumb, tend not to be early risers." Law enforcement also

noticed that he received calls from persons convicted of drug offenses. Finally, the officers observed that Barksdale ceased making outgoing calls after he had spotted what he believed to be surveillance vehicles during a controlled purchase, consistent with behavior that, according to the affiants, is exhibited by drug dealers seeking to avoid detection.

### e. *Wiretaps and surveillance*

Wiretaps on Barksdale's cell phone in September of 2005 revealed that he and Majeed were in constant contact and, according to the affidavit, their conversations were often "drug related." The wiretaps revealed that Majeed often used cell phones registered to Barksdale. When the conversations turned to drugs, the two men would encrypt their discussions to ensure that their messages got across yet enabled them to deny that they were discussing drugs. For example, the affiants related one call between Majeed and Barksdale in which they set up a meeting "[n]ot where you went to sleep but just cross from there." The officers also heard conversations in which Majeed and Barksdale talked of getting new cell phones, which drug traffickers frequently do to evade law enforcement.

Additional wiretaps on the phones of Barksdale, Cauthorn, and others supported the affiants' belief that they were involved in a major drug ring. During a conversation between Barksdale and Cauthorn, Barksdale discussed exacting revenge after he was shot. According to the officers, Barksdale's prominence as a drug trafficker in Chester made him a mark for robbers and stick-up men. If Barksdale failed to strike back, the entire drug ring, of which he was a key member, would lose status. A wiretap on Cauthorn's cell phone revealed almost daily discussions about buying and delivering drugs and collecting money from drug deals. Cauthorn regularly spoke with his drug distributers and avoided overtly discussing drugs by using the same veiled language designed to hide

the purpose behind the calls.  In one of the intercepted calls, an unidentified male told Cauthorn, "I need stuff man.  I have these people in downstairs from me buying 16th's man and."  Cauthorn responded, "No, no, no a, I'll call you tomorrow man stop talking on the phone like that."  During another intercepted call, Cauthorn spoke with an unidentified male about the quality of marijuana.  Officers also tapped Majeed's cell phone and confirmed a similar modus operandi of speaking in code when discussing drug transactions.  Such conversations were kept to a minimum – those in on the call knew exactly what was being discussed without directly stating the matter.

Majeed and Cauthorn knew that law enforcement was monitoring their movements.  For example, during an intercepted call between Majeed and Cauthorn, Majeed spotted a surveillance car while he was nearing the Ben Franklin Bridge.  Majeed then switched lanes as though he was going toward the Walt Whitman Bridge only to again switch lanes and head toward the Ben Franklin Bridge, detailing his movements as he was followed.  Cauthorn spoke of how they were "hot" and that he needed to switch cell phones.  Majeed warned Cauthorn to "go ahead and do what ya do, but just keep your eyes."[2]  The two later discussed that Cauthorn was "scared to be around [Majeed] cause [Majeed] gotta tail on me."  After obtaining new phones, the two men set up a time to meet, rather than exchange numbers over the phone.  During a call intercepted in March of 2006, Cauthorn told Majeed that he "talked to main man down the way.  I told him try to come down that way so tell

---

[2] Barksdale also proved keenly aware that his movements were being monitored.  At one point, he spotted an unmarked vehicle following him and Majeed; Barksdale then told Majeed to remove the phone numbers that he needed from the cell phone and discard the phone, because he suspected that the cell phones were the reason that the two men were being tailed.  Based upon their experience and training, the affiants believed Barskdale to be a high-level sophisticated drug trafficker who had become adept at evading law enforcement.  For instance, Barksdale "dropped" (stopped using) a particular cell phone number when he suspected the number was being tapped.  Barksdale also used prepaid cellphones in other people's names to avoid detection.

main man ya knamean, try and get that in motion yamean? Try to get that in motion yamean?" Troopers Regan and Skahill believed that "main man" referred to Kaplan and that Cauthorn wanted Kaplan involved in a drug deal in Atlanta. Indeed, officers heard Kaplan in the background during this call. Later that month, police intercepted a call between Majeed and Kaplan – which occurred shortly after a call between Majeed and Barksdale – in which they attempted to acquire cocaine from Kaplan. The next day Majeed spoke with Kaplan and ended the call by telling Kaplan that he would "call your phone just to kick it witchu and shit for a minute," which Troopers Skahill and Regan believed indicated that Majeed either wanted to talk with Kaplan about buying cocaine or that Majeed wanted to buy cocaine from Kaplan at that time. Later that day, Kaplan invited Majeed to a meeting location; Troopers Skahill and Regan concluded that Majeed would be in Kaplan's drug trafficking locale (Wayne Avenue and Wyneva Street) shortly either to conduct a drug transaction or to discuss their drug distribution network. Indeed, police later observed Majeed meeting with Kaplan inside a silver Pontiac on Wyneva Street near Wayne Avenue. The affidavit reiterates that when Kaplan and his cohorts discussed meetings related to drug trafficking, they spoke in code to shield the meaning of their conversations from law enforcement. A call between Barksdale and Majeed intercepted on March 28, 2006 suggested that the two men meet "where we go to sleep at." Troopers Skahill and Regan reported being familiar with the location "where [they] go to sleep at" and that surveillance had seen various members of the drug organization conference at that location.

The affidavit also relays an April 12, 2006 phone call in which Majeed called Kaplan in an effort to obtain cocaine. During another call later that day, Majeed told Barksdale that he was going to "go up top right now, and bullshit, wit witchacallit," which the affiants believed referred to Kaplan. Later that day, Majeed met Kaplan in the area of Wayne Avenue and Wyneva Street;

subsequently, Majeed delivered a kilo of cocaine to an unknown male, who immediately distributed the drugs to a third party in Chester. Majeed then paid Kaplan at least a portion of the money owed for the cocaine.

Just four days later, Kaplan and Majeed again discussed meeting so that Majeed could buy cocaine from Kaplan. The two men were careful not to reveal their meeting location to law enforcement officials. Kaplan did, however, indicate that he was on his way to a restaurant where he would be for about a half an hour. Kaplan told Majeed that he would call him upon leaving the restaurant so they could meet for the drug transaction. Following the conversation, Kaplan's vehicle was spotted at this restaurant. Less than an hour later, while Majeed and Kaplan again talked on the phone, Majeed's car was spotted in the area of the exit from Route 1 Northbound at Wayne Avenue and then Majeed and Kaplan were spotted together.

On April 17, 2006, Kaplan was seen on the corner of Wayne Avenue and Wyneva Street with several unknown males. Shortly thereafter, Majeed phoned Kaplan and told him that he was about to arrive. Majeed then met with Kaplan and the two walked east on Wyneva Street while others in the area appeared to act as lookouts. Majeed and Kaplan entered the residence at 122 Wyneva Street where they stayed for three minutes before they were spotted leaving the house. Majeed then drove away and within minutes placed a call that officers believed was an attempt to quickly redistribute the cocaine he just obtained from Kaplan.

On another occasion, police officers observed Majeed in the 100 block of Wyneva Street and Wayne Avenue in Philadelphia. According to CI#6, this location was a major area for Kaplan's drug trafficking. Surveillance also observed Majeed collecting money from Cauthorn after the two discussed a meeting location. On that day, prior to the exchange, officers heard the two discussing

a possible meeting in Philadelphia. Cauthorn objected to meeting because his car was "dirty," which Officers Regan and Skahill believed meant that Cauthorn had either drugs or weapons in his vehicle and therefore he did not want to risk a police officer stopping him. A subsequent cell phone call intercepted just a short while later revealed that the two men agreed to meet in Chester where they were spotted making the exchange.

Two days after this money exchange, surveillance units saw a black male exit Majeed's car and enter a barber shop on the 100 block of Wyneva Street. The male was identified as Kaplan. Subsequent phone intercepts that night lead the officers to suspect that Majeed was brokering a cocaine deal between Kaplan and another male, identified as Melina. Later that same evening Majeed spoke with Melina about a meeting place for the drug transaction. Majeed told Melina that he had someone in his car with him; surveillance revealed that Kaplan was driving with Majeed.

*f.      Subsequent affidavits*

The subsequent wiretap applications relied on the core affidavit and contained progress reports on the investigation. The remaining affidavits detailed additional phone conversations and meetings between members of the alleged drug organization. For example, the August 2, 2006, affidavit included a call between Barksdale and Kaplan in which the two men agreed to meet at a barber shop located at Wayne Avenue and Wyneva Street. Surveillance units saw the two men meet and, according to the affidavit, "[t]he meeting [was] brief and [was] conducted in a manner in which countless drug sales are conducted, that being the two persons meet, they get into one car and take a short drive while they conduct the sale, and eventually one party is dropped back at his vehicle." The affidavits also included calls between Kaplan and Mason. Given the cryptic nature of these conversations, which mimicked those of Barksdale, Cauthorn and Majeed, law enforcement believed

they were drug related.

## 2. *Mason*

Mason seeks to suppress evidence collected from a wiretap of a phone registered to Alison Walker and frequently used by Mason.

On April 13, 2006, officers intercepted a call from Mason to Donald Johnson in which Mason told Johnson that he was going away and asked Johnson if he had enough cocaine to supply his customers in his absence.[3] Phone calls intercepted by law enforcement officials confirmed that Mason frequently used lingo indicating that he maintained a supply of cocaine. Officers also believed that Mason and Johnson talked about using a woman as a straw purchaser of weapons for Johnson, who, as a convicted felon, cannot himself purchase a gun. Additional phone calls between Mason and Johnson led officers to believe that the two men were arranging a drug transaction consummated on May 19, 2006, when Johnson went to see Mason, presumably to obtain cocaine.

During one chain of intercepted calls, Mason told Johnson, "I hope you didn't forget you had that extra onion." According to the affidavit, an "onion" is an ounce of cocaine. In the span of approximately one minute, Mason called Johnson three times and informed him that the package of cocaine Mason provided to Johnson contained an extra ounce of cocaine. Mason noted that he was not sure "if you just gave it straight to somebody." Presumably, Mason wanted Johnson to know the actual amount of cocaine he delivered to Johnson so that Johnson would not sell more cocaine than he thought he was selling. Johnson and Mason also discussed where Mason could purchase marijuana.

Mason and Johnson frequently discussed their cocaine trafficking business in cryptic

---

[3] In addition to being his cocaine supplier, Mason is also Johnson's uncle.

language in an effort to avoid detection. For example, in one intercepted call in Johnson informed Mason that a member of the conspiracy was arrested and caught with cocaine. Mason told Johnson that he still expected to be paid for the cocaine he had supplied to Johnson, which had then been distributed to the arrested member. During another call, one of Mason's customers complained that a package of cocaine he received from Mason was short seven grams of cocaine. Mason informed his customer that he mistakenly thought he placed a green piece of paper in the cocaine package that was short. Shortly thereafter, Mason's distributor reported that he sold the package that was short seven grams, although Mason checked to ensure that his distributor "let him know you'll give it right back to him right?" About a half an hour later, Mason called the distributor because he was unsure that the cocaine he gave to the distributor really was short seven grams. Mason said, "you should try and backtrack and check everything that you did too because I . . . still got the [package of cocaine] that was [short as he marked it]."

In another call, Mason told Johnson "don't jump the gun." According to the affiants, Johnson was trying to score some cocaine from Mason, his supplier, but Mason had not yet heard from his sources. Mason wanted Johnson to be patient rather than go to another cocaine supplier for his needs. Shortly after this call, Mason and Johnson again could be heard discussing drug trafficking. Mason told Johnson that he was on his way to Philly to see "homeboy" (believed to be Kaplan) before Mason "go[es] all the way up." During this call, Mason informed Johnson that he was going to check with Kaplan to see if Mason could get drugs from Kaplan in quantities sufficient to satisfy Johnson. If Kaplan could not provide enough cocaine, Mason would "go all the way up" to his suppliers in New York. Indeed, shortly after this call, Mason and Kaplan were seen meeting in Philadelphia and Mason then traveled to New York.

Mason was later seen in New York meeting with a black man operating a Chevy Impala. Three minutes later, Mason entered the driver's seat of the Impala carrying a black bag from his vehicle. The man then entered into the driver's seat of Mason's vehicle and Mason left in the Impala. About twenty minutes later, Mason returned to his original location in the Impala and again switched vehicles with the man. Mason drove off and was later observed parking the van and walking past an undercover officer before sitting down on a park bench. Mason eventually returned to the van and drove for a while before parking in a different location and exiting the vehicle while talking on a cell phone. At some point, he returned to the van and drove to another location for another meeting with the man from the Impala. Eventually, Mason entered the passenger seat of the Impala and the Impala left. A couple of days later, Mason told Johnson that "[i]t was just like a desert up here you know," an indication that he was unable to score drugs while up in New York. Based on subsequent phone calls between Johnson and Mason, it is believed that the two men discussed Mason's trip to New York shortly after Mason returned.

**B.      Legal Analysis**

*1.      Probable Cause*

Electronic audio surveillance is governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq*. Judicial authorization is required prior to wiretapping. 18 U.S.C. § 2516. A judge may authorize a wiretap if: (1) "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter [which includes drug related offenses]," (2) "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception," and (3) "there is probable cause for belief that the facilities from which, or the place

where, the . . . electronic communications are to be intercepted are being used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person." 18 U.S.C. §§ 2518(3)(a)-(b), (d).

Probable cause under Title III is assessed using the same standard employed for determining probable cause for property searches under the Fourth Amendment. *United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983). The authorizing judicial official must examine the totality of circumstances and decide whether the government has shown a probability of criminal activity. *Illinois v. Gates*, 462 U.S. 213, 235 (1983). The probable cause determination permits a judge to consider reasonable inferences made by police officers based on their specialized training and expertise. *United States v. Arvizu*, 534 U.S. 266, 277 (2002). This Court is required to uphold a finding of probable cause if the affidavit supporting the warrant application provides a substantial basis for the finding of probable cause. *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001). "This does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions; it does require the application of a common sense standard." *Tehfe*, 722 F.2d at 1117 (citations omitted). However, the magistrate judge's probable cause determination is entitled to "great deference." *Hodge*, 246 F.3d at 306 (citing *United States v. Loy*, 191 F.3d 360, 365 (3d Cir. 1999)).

According to Kaplan and Mason, the affidavits are merely "speculative assertions of law enforcement officers" and are "an empty shell, devoid of facts from which a neutral and detached judicial officer could find probable cause." (Kaplan's Mot. to Suppress at 16.) Kaplan asserts that the Government's argument that the absence of extensive discussion about drugs provides probable cause to believe that Defendants are involved in illegal drug activity is rank conjecture.

Defendants' argument that their failure to explicitly and repeatedly refer to illegal drugs

precludes a finding of probable cause is unpersuasive. Given the totality of the circumstances, it was reasonable to believe that Kaplan and Mason were engaged in a large-scale sophisticated drug ring. The drug ring, of which Kaplan and Mason are alleged to be key figures, would be quite unsophisticated if its members constantly and specifically mentioned buying and selling drugs. It is unrealistic to expect phone confessions from people aware that law enforcement is tracking them. It is therefore unsurprising that these conversations are subject to differing interpretations. Such disagreements over their meanings does not, however, negate probable cause. *United States v. Majeed*, Crim. A. No. 08-186, 2009 WL 2393439, at *3 (E.D. Pa. Aug. 4, 2009) ("Courts have specifically found that troopers' interpretations of coded conversations can support probable cause in obtaining a warrant.") (collecting cases); *see also United States v. Mark*, Crim. A. No. 2006-80, 2007 WL 2669576, at *7 (D.V.I. Sept. 5, 2007) (citing *United States v. Gray*, 410 F.3d 338, 344 (7th Cir. 2005) (probable cause existed although intercepted conversation could be interpreted in various ways)).

The lengthy affidavits in support of the wiretaps at issue here set forth in specific detail the affiants' basis for asserting Defendants were engaged in a criminal enterprise. The judge approving the warrants had before him affiants with significant experience and expertise. He was entitled to give due consideration to the conclusions of experienced law enforcement officers. *See United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000). Contrary to Defendants' assertion, the affidavits contain much more than rank speculation. Law enforcement officials were involved in a large-scale investigation that used confidential informants, electronic surveillance, and controlled buys in an effort to bust what appears to be a massive drug trafficking operation. The affidavits detail phone calls and meetings involving Defendants that reasonably lead one to believe Kaplan and Mason were

involved in illegal drug trafficking. Kaplan and Mason surrounded themselves with known drug dealers, acted in a manner consistent with those who conduct drug transactions and purposely spoke in a furtive manner to conceal their activities. Given the circumstances, Defendants' interpretation of their conversations as harmless chit-chat is not supported by the voluminous affidavits before this Court. Ample probable cause existed for the wiretaps.

It has been brought to this Court's attention that the Honorable Legrome Davis, who is presiding over a case involving Majeed, discovered that wiretap extension applications for the two cellular phones used by Majeed recited summaries of the same intercepted conversations. Judge Davis had the parties brief this error and this Court also afforded the parties an opportunity to address the issue. Defendants largely repeat their prior arguments but also add that the issuing judge's failure to spot the errors demonstrates that he failed to review the applications. This conclusion is without basis and this Court will not assume that a judge evaded his duties to review an application for a wiretap because it was lengthy. Regardless of whether he spotted the error, this Court agrees with Judge Davis' analysis and ultimate conclusion that the applications support a finding of probable cause. *Majeed*, 2009 WL 2393439, at **10-12. Furthermore, the Government's error does not affect any of the wiretap applications that it will seek to admit during trial and no other wiretap applications were affected by the error. This issue regarding the Government's mistake is much ado about nothing and does not negate any probable cause findings as to Kaplan or Mason.

## 2. Necessity

Kaplan and Mason also contend that the officers' affidavit did not include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," as required by

28 U.S.C. § 2518(1)(c).

Before a judge issues an order authorizing a wiretap, he or she must determine, on the basis of the facts submitted by the applicant, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or be too dangerous." 18 U.S.C. § 2518(3)(c). This is often referred to as the necessity requirement. The Government, however, need not "exhaust all other investigative procedures before resorting to electronic surveillance." *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997) (citations omitted). Rather, the Government need only show "there is evidence that 'normal investigative techniques . . . reasonably appear to be unlikely to succeed if tried.'" *Id*. (quoting 18 U.S.C. § 2518(3)(c)). The Government "need only lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient." *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992) (quoting *Untied States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975)). To determine whether the Government has met the necessity requirement, a court may take into account affirmations founded in part upon the specialized training and experience of law enforcement officials. *Williams*, 124 F.3d at 418 (quotations omitted). The Government's showing of necessity "is to be 'tested in a practical and commonsense fashion.'" *McGlory*, 968 F.2d at 345 (quoting *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976)).

Kaplan and Mason argue that the wiretap applications failed to demonstrate the necessity for electronic surveillance. According to Defendants, the Government provided nothing more than speculative assertions and conjecture and offered no specific facts that would show why techniques such as controlled purchases were not tried or had previously failed.

The Government properly laid a factual predicate informing Judge McCaffery why

wiretapping was necessary. Troopers Regan and Skahill, both experienced and highly-trained in drug enforcement, set forth in specific detail why other investigative methods were insufficient. The officers pointed out that drug dealers hide their dealings with drug purchasers in an effort to conceal the scope of the drug trafficker's operations. Drug purchasers are rarely introduced to major drug sources. Here, the Troopers believed it highly unlikely that their confidential informants would be introduced to higher level players in the drug organization that the officers sought to infiltrate. They also stated that "[v]isual (physical) surveillance has been utilized in this investigation. Surveillance has not, and likely will not, be able to establish the precise manner in which Kaplan receives his controlled substances or the identity of all of his supplier(s)." Wiretaps were needed because surveillance had not uncovered where Kaplan's stash house(s) were located or where his assets could be found. The affidavit further averred that search warrants executed on Kaplan's residence(s) may uncover drugs, but they would not reveal his supplier(s) and/or customers unless those individuals were fortuitously at the location being searched. A search warrant would therefore likely tip-off the entire organization and lead to the destruction of evidence and the movement of those in the organization. The Government also stated that it was using pen registers in its investigation but that method of investigation would only go so far in identifying those involved in the drug ring. Finally, the affiants feared that using a grand jury would alert suspects to the investigation and put cooperating individuals at risk.

This information was more than sufficient to meet the Government's necessity requirement.[4]

_____

[4]Subsequent wiretap applications contain similar statements of the need for continued electronic surveillance. (July 20, 2006 Aff. at 462-68; Aug. 2, 2006 Aff. at 419-26; Aug. 14, 2006 Aff. at 382-388; Aug. 29, 2006 Aff. at 373-379; Sept. 12, 2006 Aff. at 404-410; Sept. 27, 2006 Aff. at 383-389.) The Court has reviewed these statements and finds that they comport with the requirements set forth by the Third Circuit.

The Government used a number of techniques during the course of its investigation of Kaplan. While these efforts undoubtedly uncovered useful information, the Government remained unable to discover certain key information. Infiltrating the drug ring posed evident dangers. The necessity requirement seeks to balance the Government's need to use certain invasive surveillance techniques with an individual's right to use electronic communication methods secure in the knowledge that the Government is not listening in. But once the government shows the need for a wiretap, a court should not handcuff the government by prohibiting it from using a successful method of surveillance.

Similarly, the June 22, 2006 application's presentation of the need for electronic surveillance satisfies the necessity requirement. As to Mason, the affidavit states that using confidential informants was insufficient to secure a meeting with Mason because "dealers often do not wish to place their customers in direct contact with their source(s) of controlled substances. Such an action would eliminate the dealer from the chain of profit and thereby remove any monetary gain that the dealer would earn from future drug transactions." The Troopers also contended that surveillance had not provided ample information to prosecute Mason and failed to reveal the location(s) of his stash house(s). Furthermore, the troopers reasonably believed that Mason maintained a "cautious approach to drug trafficking which makes surveillance of him a difficult task." Mason, like Kaplan, is considered a significant player in a widespread drug operation. To prosecute one in the upper echelon of the drug trade, the government must be able to use all of the tools in its arsenal. The affidavits submitted in support of the wiretapping applications show a concerted effort to use a multitude of investigations techniques. They amply demonstrate that techniques short of wiretapping were insufficient to reveal the full nature and scope of the drug organization in which Kaplan and Mason were involved. Consistent with the law, the Government properly demonstrated that

electronic surveillance was necessary in their investigation of Kaplan and Mason.

### 3. Jurisdiction

Title III requires that an application for a wiretap "be made in writing upon oath or affirmation to a judge of competent jurisdiction." 18 U.S.C. § 2518(1). A "Judge of competent jurisdiction" includes "a judge of any general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interception of wire, oral, or electronic communications." 18 U.S.C. § 2510 (9)(b). The wiretaps were authorized by Judge (now Pennsylvania Supreme Court Justice) Seamus McCaffery, at the time, a Superior Court Judge in Pennsylvania. Defendants argue that the Pennsylvania Superior Court is a court of limited jurisdiction and therefore lacks authority under federal law to issue wiretaps. According to Defendants, because Pennsylvania's Courts of Common Pleas have statewide jurisdiction over criminal matters, the Superior Court cannot be a court of "general criminal jurisdiction."

Pennsylvania's Superior Court, except in limited circumstances not relevant here, has no original jurisdiction. 18 Pa. Cons. Stat. Ann. § 741 (2008). But it does not follow that the Superior Court is therefore disqualified from being a court of general criminal jurisdiction under Title III. The statute does not say "a judge of a court with original criminal jurisdiction." And Pennsylvania law grants the Superior Court "exclusive appellate jurisdiction of all appeals from final orders of the courts of common pleas, *regardless of the nature of the controversy or the amount involved*." 18 Pa. Cons. Stat. Ann. § 741 (emphasis added). Thus, the Pennsylvania Superior Court is charged with hearing criminal appeals. Furthermore, Title III permits federal appellate judges to sign off on wiretap applications, evidencing no aversion to appellate judges signing electronic surveillance warrants. The Court therefore concludes that the Pennsylvania Superior

Court is a court of general criminal jurisdiction as contemplated by Title III. *See Majeed*, 2009 WL 2393439, at *3.

Pennsylvania law requires one permitted to apply for an order to intercept a wire, electronic, or oral communication to make such written application to "any Superior Court judge." 18 PA. CONS. STAT. ANN. § 5708. Given this statutory authorization, a Pennsylvania Superior Court judge falls within Title III's definition of "Judge of competent jurisdiction." This Court finds that Judge McCaffery – or any Pennsylvania Superior Court judge for that matter – possessed the power to authorize the wiretaps.[5]

## II.    KAPLAN'S PROPERTY

### A.    Factual Background

Officers Skahill and Regan also obtained search warrants for a third floor apartment located at 416 Chelten Avenue in Philadelphia, property at 122 West Wyneva Street in Philadelphia, and a Nissan Maxima that Kaplan operated. Kaplan seeks to exclude evidence obtained from these searches.

The affidavits in support of these three search warrants aver that on November 20, 2006, Kaplan was observed leaving his girlfriend's house in Delaware County driving a Nissan Maxima. Kaplan and an associate, Donald Johnson, entered the Maxima after leaving a residence at 4625 Pulaski Avenue in Philadelphia. Approximately one hour later, the two men arrived at 416 Chelten Avenue and Kaplan parked the Maxima at the rear of the building. Kaplan and Johnson entered the

---

[5] Tellingly, Defendants failed to cite any law from a federal district court in Pennsylvania or the Third Circuit that supports the proposition that Pennsylvania's law requiring wiretap authorizations be submitted to Superior Court judges runs afoul of Title III.

building and remained there for approximately thirty minutes before returning to the Maxima. Approximately fifteen minutes later, Kaplan and Johnson arrived and parked on the 4600 block of Pulaski Avenue in the vicinity of a white Ford Taurus. Kaplan exited the Maxima and entered the building at 4625 Pulaski Avenue. Johnson exited the Maxima, went to the Taurus and then returned to the Maxima for a couple of seconds before departing in the Taurus. Officers followed the Taurus and attempted to stop it in Delaware County. Johnson fled without stopping and was seen throwing a package out of the driver's side window of the Taurus. The chase continued into Chester but Johnson's escape was thwarted when a minor car accident occurred. Johnson then exited the Taurus and fled on foot. He was captured and officers retrieved the package thrown from the Taurus. The contents of the package tested positive for cocaine. Trooper Regan interviewed Johnson who admitted to purchasing a kilogram of cocaine, but he was less than forthcoming about his dealings with Kaplan.

After Johnson was arrested, three troopers went to 416 Chelten Avenue. They interviewed a resident living there who told them that a black male lives in the sole apartment on the third floor and parks his car in the rear of the building. Shortly after this interview, a trooper saw a black male driving a 2002 Nissan that had been observed in the area of Wayne Street and Wyneva Avenue arrive at 416 Chelten Avenue.[6] Law enforcement ran the registration on the Nissan and discovered it was registered to Mark Harris, an associate of Kaplan who had been seen with Kaplan on numerous occasions. After the man entered the building, the lights in the third floor apartment were turned on.

Kaplan was then arrested near a barbershop located at the corner of Wayne and Wyneva Avenue and the Maxima was towed to police barracks.

_____

[6] This is not the Nissan that was the subject of the search Kaplan seeks to exclude.

### B.      Probable Cause

To obtain a search warrant, the supporting affidavit must establish probable cause to search the location; probable cause is established "when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Hodge*, 246 F.3d at 305 (quoting *Gates*, 462 U.S. at 238).  Probable cause may be inferred by "considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [evidence]." *Jones*, 994 F.2d at 1056 (quoting *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir. 1985)).  Although conclusory statements cannot establish probable cause, proof beyond a reasonable doubt is not required.  *Gates*, 462 U.S. at 235-39.  Rather, a judge must make a practical, common-sense determination based on whether the circumstances in the affidavit suggest a fair probability that contraband or evidence of a crime will be found in  a particular place." *Gates*, 462 U.S. at 218, 230-31; *see also Whitner*, 219 F.3d at 296.  This Court must afford "great deference" to the magistrate's probable cause determination and must uphold it if there is a "substantial basis for" finding probable cause.  *Gates*, 462 U.S. at 236; *Hodge*, 246 F.3d at 305; *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993); *Jones*, 994 F.2d at 1055.  "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Jones*, 994 F.2d at 1057-58 (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Police officers sought and obtained a warrant to search the third floor apartment of a three-story stone twin residence at 416 Chelten Avenue in Philadelphia, Pennsylvania.  They also obtained search warrants to search a residence at 122 West Wyneva Street in Philadelphia and a gold Nissan Maxima registered to Theodore Singleton.  According to affidavits, Kaplan is the owner of the

residence at 122 Wyneva Street and has listed that location as his address. Kaplan was renting the apartment located at 416 Chelten.

On the night before the search warrants were acquired, Johnson was observed driving to Philadelphia, where he met with Kaplan. He was apprehended shortly thereafter having attempted to discard a package of cocaine. Just prior to this arrest, Johnson was seen entering the third floor apartment at 416 Chelten Avenue with Kaplan.

Additionally, the affidavits make clear that the experience and expertise of law enforcement officers teaches that drug traffickers must often prepare drugs before they can be sold, often by adding a dilutant to the cocaine (known as "cutting") and then weighing and packaging the mixture. Thus, officers expect to find evidence of drug trafficking, including paraphernalia such as baggies and scales, in the residences and vehicles of suspected drug traffickers. Officers also expect to find handguns and other weapons at the residences and in the vehicles of suspected drug traffickers. The affiants also claimed that drug traffickers often store proceeds from drug sales, weapons, and of course drugs in their homes to avoid detection, to maintain control over their contraband, and to avoid thefts from other drug dealers.

Based on this series of events, there was a reasonable probability that the apartment, where drug-related business was conducted, and the Maxima, which was used in the transaction, contained evidence of drug-related activity. And with respect to Kaplan's home, the Third Circuit has recognized that evidence of drug crimes is likely to be found where a drug dealer resides. *See Whitner*, 219 F.3d at 297-98. This is particularly true in a case like this one involving a large drug ring. *Hodge*, 246 F.3d at 306 ("It is reasonable to infer that a person involved in drug dealing on such a scale would store evidence of that dealing in his home."). A drug dealer cannot simply flaunt

his trade out in the open and therefore must attempt to conceal evidence of his crimes. If, as the Third Circuit has concluded, a drug dealer could logically conclude that his home would be the best and perhaps only place to stash evidence of his crimes, it must follow that it is reasonable for law enforcement to believe that they will find this evidence in the drug dealer's home. *See Whitner*, 219 F.3d at 298; *see also United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002). Furthermore, when Johnson was questioned he was evasive about where he obtained the cocaine, leading to the reasonable conclusion that he was attempting to protect Kaplan and the location of Kaplan's stash houses. *See Whitner*, 219 F.3d at 299 (noting that deceptive answers to police questioning leads to "reasonable inference that [the defendant] was attempting to conceal the existence of [a particular location]" and "logically suggests that [the defendant] was storing some evidence of illegal activity at the [particular location].")." These reasonable inferences obviate the need for any direct evidence linking a defendant to a particular location. *Hodge*, 246 F.3d at 307.

The affidavits set forth a reasonable basis to believe that the Maxima and apartment were used for conducting drug transactions and that Kaplan would stash drugs and related paraphernalia in property that he owned. Thus, the search warrants of Kaplan's property were based on probable cause and the evidence found in these locations is not subject to suppression.

## III.     MASON'S PROPERTY

### A.     Factual Background

On June 10, 2006, Mason told Johnson that he was on his way up to Philadelphia to see "homeboy" and that he would talk with Johnson later about supplying him with drugs. That afternoon, Mason was seen meeting with Kaplan in Philadelphia before he drove up to New York.

Mason was seen operating a silver Town and Country minivan bearing Pennsylvania registration GKJ0395 and belonging to Shelly Hayes.  The minivan was seen in New York City but was lost on the George Washington Bridge.  Later that day, Mason was observed at St. Nicholas Boulevard and West 145th Street in New York City.  Mason was seen meeting with an African-American male driving a Chevy Impala.  Mason took a black bag from his vehicle and sat down in the driver's seat of the Impala while the male entered the driver's seat of Mason's vehicle.  Mason then left in the Impala and traveled to 148th Street.  Shortly thereafter, Mason returned to the area where his minivan was parked and switched vehicles with the male.  Mason proceeded to drive in the van until he parked at 138th Street.  Several minutes later, he got out of the van, walked past Trooper Regan, crossed the street and sat on a park bench on St. Nicholas Boulevard.  About an hour later, Mason was seen meeting with the same African-America male from the Impala.  Eventually, Mason got into the passenger seat of the Impala and departed the area.

According to the affidavit, Mason was apparently unable to obtain large amounts of cocaine while in New York.  He phoned Johnson on June 10, 2006, while he was still in New York, and said, "Yeah, well I'm still up here man.  It was just like a desert up here you know.  Umm, I mean just like a fuckin' desert that's all that was around you . . . I'm on my way back though I'm gonna still kick it with you when I get out there."  On June 12, 2006, Mason and Johnson met, presumably to discuss Mason's trip to New York, during which police believe Mason may have scored some cocaine but not in the quantities he was hoping.  A subsequent wiretap also revealed that Mason was in New York seeking cocaine to supply to Johnson.  In fact, Mason called Johnson to "see how you lookin'" meaning that Mason wanted to know if he needed to get Johnson additional cocaine while Mason was in New York.  The same day as this call, Mason was seen operating the Town and County

minivan on Interstate 95 towards Chester and meeting with Johnson in Chester.

On July 11, 2006, law enforcement intercepted a call believed to be from one of Mason's New York cocaine suppliers. The man asked Mason, "When you coming around?" Purportedly, the man had cocaine available for Mason. Mason responded that "I'm coming back early tomorrow. I'm just waiting on some umm a few things out this way." On July 13, 2006, Mason told an unknown male that he would likely be in New York the following day. Mason later reported that he expected to be in New York around 3:00 p.m. On July 15, 2006, Mason met with Johnson – perhaps so Johnson could drop off money to Mason and receive cocaine from Mason.

On July 16, 2006, Mason was heard talking to a person who identified himself on the phone as "Bali." Mason told Bali that he had some good news for him, but Bali told Mason that he was not currently in the city. Troopers Skahill and Regan believe that Bali is one of Mason's cocaine distributers and that Mason was telling him that he would soon have cocaine available. Bali then informed Mason that he would meet with him when Mason arrived in New York. The next day, Mason told Donald Johnson that he needed to see him. Mason then spoke with a man believed to be one of his cocaine suppliers and learned that the man had cocaine available.

On July 18, 2006, while in New York, Mason told one of his customers that "it's a go for sure," meaning that Mason would soon have cocaine available for delivery and distribution. Almost immediately after this call, Mason told a customer to "come to the hill, St. Nick's, 45th [believed to be St. Nicholas Boulevard and West 145th Street in New York], twenty minutes." The man balked at the location but Mason retorted, "I mean it's easier for me here, I would rather you come here, for real, for real." The affiants believed that Mason insisted on this particular location because he had cocaine for the man, but Mason did not want to risk being arrested by traveling to a location far from

him.  After another conversation between the two men, in which they negotiated the location of their meeting, the man agreed to meet Mason where Mason requested.

On July 19, 2006, Mason and Johnson talked about Mason securing cocaine and returning to Chester from New York City.  Mason said that he was ready, but Johnson told Mason that he was not quite ready for his return, which Troopers Skahill and Regan understood to mean that Johnson had yet to collect all of the money he owed Mason.  Mason also told Johnson to check with some of Johnson's "big boys" so Mason would not have to stash the drugs.  That same day, Johnson had a conversation with Malik Sullivan in which Johnson told Sullivan that his "peoples on they way from down the city now," which the affiants contend referred to the fact that Mason was expected to be returning with cocaine soon.

On July 19, 2006, at 4:20 p.m., a Pennsylvania State policeman spotted a silver Town and Country vehicle enter a service plaza on the New Jersey Turnpike and saw an individual that she recognized as Mason, wearing a white short sleeve shirt with capri-type pants and white shoes, standing on the driver side of the vehicle speaking to the gas station attendant.  Mason entered the service plaza building and returned to the car about two minutes later.  He entered the driver's side of the Town and Country minivan and began traveling southbound on the New Jersey Turnpike. Troopers Thompson, Scott and Regan followed Mason as he traveled southbound on I-95.  Trooper Kevin Shanahan, upon direction from Trooper Skahill, stopped the vehicle on I-95 in Chester. Trooper Shanahan told Trooper Regan that he stopped the vehicle for following too closely and because a tire had dangerously low air pressure.  Upon approaching the vehicle, Trooper Shanahan smelled a strong scent of air fresheners coming from the passenger compartment and noticed a number of air fresheners in the vehicle.  Trooper Shanahan also said that the operator of the vehicle

appeared extremely nervous.  The driver produced a Delaware license for Leonard Mason and the picture on the license matched that of the vehicle's driver.  Mason indicated that the address on the license was his current address.  When first asked, Mason said that the vehicle belonged to his nephew's cousin's girlfriend, but later said that it belonged to his nephew's cousin.

Trooper Shanahan returned to his patrol car and when he returned he asked Mason if he had ever lived in Chester.  Mason said that he had not, but Trooper Shanahan told Mason that records indicated that Mason had a suspended Pennsylvania license that listed an address in Chester, Pennsylvania.  Mason insisted that he was born in New York and had never lived in Chester.  Trooper Shanahan informed Mason that his New York license had also been suspended.  Trooper Shanahan told Mason that he would not be permitted to drive from the scene and that the vehicle was going to be towed.  Mason tried to prevent having the vehicle towed and attempted to remove several items from the vehicle.  Ultimately, the vehicle was towed to a secure indoor garage**.**

Affiants requested a nighttime search warrant because the application for the warrant was made after 9 p.m. and individuals were already seeking the return of the vehicle.  Furthermore, it was believed that a large amount of cocaine would be uncovered and the police were concerned about securing the vehicle.  Finally, the police wanted to inform the owner that the vehicle was subject to an inventory search and sophisticated drug traffickers such as Mason would not believe that an inventory search was delayed.  After obtaining the search warrant, the vehicle was searched and drugs were found in the vehicle.

### B.      Probable Cause[7]

Although the police properly obtained a warrant here, a warrant was not necessary.  Given the "ready mobility" of vehicles, the automobile exception to the warrant requirement allows law enforcement officers to seize and search a vehicle without a warrant if "probable cause exists to believe it contains contraband."  *Burton*, 288 F.3d at 100 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).  Mason argues that Trooper Shanahan's stated reason for stopping the vehicle – that Mason was tailgating – lacks any factual basis.  (Def.'s Supplemental Mem. in Supp. of Def.'s Mot. to Suppress Physical Evidence from Illegal Vehicle Stop, Seizure and Search Warrant at 2-3.) Mason also takes issue with whether he was operating the vehicle with a suspended Pennsylvania license at the time he was pulled over.  (*Id*. at 3-5.)  These arguments miss the point.  At the time the vehicle was pulled over, the police had probable cause that it contained drugs.  Therefore, no additional reason for the stop and search was necessary.

Based on the information in the affidavit, coupled with the affiants' experience and expertise, they believed they would find drugs and/or drug related items, such as scales, plastic bags, and cutting materials, in the vehicle.  Given the facts before the judge who issued the warrant, it was reasonable to believe that Mason was part of a large-scale sophisticated drug organization, that he often traveled to New York to secure drugs and conduct drug business, that he informed his confederates that he would soon have drugs available for sale, and that the vehicle he was operating would contain evidence of his drug dealings.

This Court concludes that there was probable cause for the stop of Mason and for towing the

---

[7] Although Mason did not own the vehicle searched, he has standing to challenge the search.  *See United States v. Baker*, 221 F.3d 438, 442-43 (3d Cir. 2000) (holding that defendant had standing to object to search of borrowed car based on his substantial control of vehicle).

vehicle, and a sufficient basis existed to find that there was probable cause to search the minivan.

Additionally, at the time of the stop, law enforcement had probable cause to believe that the van in

which Mason was traveling would contain evidence of illegal drug activity. Police had been

following his movements and had witnessed Mason engaged in what could be reasonably be believed

to be drug dealing. His conversations with his associates also reasonably led police to conclude that

he was completing a drug run from New York, that he was bringing drugs into Pennsylvania, and

that said drugs were likely to be found in the vehicle at the time he was stopped. Furthermore, it was

reasonable to permit a nighttime search of the vehicle. Mason's motion to suppress is denied.


## IV.     GOOD FAITH EXCEPTION

The Government contends that even assuming there was no probable cause for any of the

searches at issue here, the good faith exception precludes exclusion of the evidence obtained. Under

the good faith exception, the fact that a magistrate did not have a substantial basis for a probable

cause finding is by itself insufficient to warrant exclusion. *See United States v. Leon*, 468 U.S. 897,

926 (1984). If an officer executes a warrant in objectively reasonable reliance on the warrant's

authority, exclusion is inappropriate. *United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993). "The

test for whether the good faith exception applies is 'whether a reasonably well trained officer would

have known that the search was illegal despite the magistrate's authorization.'" *Loy*, 191 F.3d at 367

(quoting *Leon*, 468 U.S. at 922 n.23)). Generally, a warrant is sufficient to show that the search was

conducted in good faith, but the Third Circuit has identified four situations in which the officer's

reliance would be objectively unreasonable: (1) if the magistrate issued the warrant in reliance on

a deliberately or recklessly false affidavit; (2) if the magistrate abandoned his judicial role and failed

to execute his duties in a neutral and detached manner; (3) if the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) if the warrant was so facially deficient that it does not state the place to be searched or the items to be seized with any specificity. *Hodge*, 246 F.3d at 308.

Kaplan and Mason argue, rather tersely, that "at a minimum, items 2 and 4 apply to this situation." (Kaplan's Mot. to Suppress at 38.) Defendants also argue that the good faith exception does not apply to Title III.

The Court holds, in the alternative, that even if probable cause was lacking, the good faith exception applies to the searches of Defendants' real and personal property and suppression would therefore be inappropriate. As for the application of the good faith exception to the wiretaps, the Third Circuit has not yet determined if the good faith exception applies in the context of wiretaps. When faced with the question whether the good faith exception articulated in *Leon* applies in the context of wiretapping, courts have reached different conclusions. *Compare, e.g., United States v. Brewer*, 204 F. App'x 205, 208 (4th Cir. 2006) ("[A]ffiants were entitled to rely on the facially valid wiretap orders pursuant to the good faith exception."); *United States v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994) (because legislative history of Title III showed clear intent to adopt Fourth Amendment principles, good faith exception applied); *United States v. Malekzadeh*, 855 F.2d 1492, 1496-97 (11th Cir. 1988) (applying good faith exception to wiretap); *United States v. Tabas*, Crim. A. No. 92-171, 1993 WL 23781, at *4 (E.D. Pa. Feb. 3, 1993) ("The good faith exception applies to wiretap affidavits.") *with United States v. Rice*, 478 F.3d 704, 711-14 (6th Cir. 2007) (holding that good-faith exception did not apply to warrants obtained under Title III); *see also United States v. Ambrosio*, 898 F. Supp. 177, 187 (S.D.N.Y. 1995) ("There is some conflict among courts that have considered the

issue as to whether the good faith exception should apply to wiretap warrants. While most courts apply *Leon*'s good faith exception to wiretaps, some courts have refused to do so.") Because this Court has concluded that law enforcement's actions in using audio surveillance here comported with the law, the Court declines to delve into the issue of whether the good faith exception applies to Title III.

As for the property searches, however, Defendants put forth no basis that any of the magistrates here abdicated their duties. If Defendants mean to imply that the length of the affidavits led the magistrates simply to rubber stamp the warrants, the Court rejects this implication as unsupported by any evidence. Furthermore, all of the warrants at issue here sufficiently state the places to searched and items to be seized. The police officers were not left to rummage around personal property in the hopes that they would uncover evidence of illegal activity. Rather, this was a sophisticated, on-going investigation conducted by experienced and well-trained officers. The officers were entitled to rely on the warrants and did so in good faith.

## V.      CONCLUSION

The Government's searches and seizures of the property of Mason and Kaplan complied with the law, as did the Government's wiretap applications. Therefore, Defendants' motions to suppress are denied in their entirety. An appropriate Order will be docketed with this opinion.