## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | **CRIMINAL ACTION** |
| **v.** | : | |
| | : | **No. 06-719** |
| **EDWARD KAPLAN,** *et al.* | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                    **September 13, 2010**

On April 16, 2010, following an eight-day trial, Defendants Edward "Pooh" Kaplan and

Leonard Mason were convicted of various drug-related charges. Specifically, the jury found Kaplan

guilty of conspiracy to distribute a controlled substance, distribution of a controlled substance,

possession with intent to distribute a controlled substance, and possession with intent to distribute

a controlled substance near a school. The jury found Mason guilty of conspiracy to distribute a

controlled substance and possession with intent to distribute a controlled substance. Presently before

the Court are Kaplan's motion for a new trial and Mason's motion for acquittal or, in the alternative,

for a new trial. For the reasons that follow, the motions are denied.

## I.       STANDARD OF REVIEW

Rule 29 provides that "[i]f the jury has returned a guilty verdict, the court may set aside the

verdict and enter an acquittal." FED R. CRIM. P. 29(c)(2). The court must view the evidence in the

light most favorable to the prosecution and must uphold the verdict provided that any rational trier

of fact could have found guilt beyond a reasonable doubt given the available evidence. *United States*

*v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). Defendants face an uphill battle under this "highly

deferential standard." *United States v. Carbo*, 572 F.3d 112, 119 (3d Cir. 2009). A challenge to the

sufficiency of the evidence supporting a jury verdict "should be confined to cases where the prosecution's failure is clear." *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1994)).

"Courts must be ever vigilant in the context of Federal Rule of Criminal Procedure 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Brodie*, 403 F.3d at 133 (citing *United States v. Jannotti,* 673 F.2d 578, 581 (3d Cir. 1982) (en banc)).

Rule 33 of the Federal Rules of Criminal Procedure permits a court to vacate any judgment and grant a new trial "if the interest of justice so requires." "[M]otions for new trials are disfavored and are only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 F. App'x 513, 516 (3d Cir. 2003) (citing *United States v. Allen*, 554 F.2d 398, 403 (10th Cir. 1977)).

Unlike a Rule 29 motion, a court does not view the evidence in the light most favorable to the government when considering a Rule 33 motion but rather exercises its own judgment in evaluating the government's case. *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Nonetheless, "a district court 'can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted.'" *United States v. Davis*, 397 F.3d 173, 181 (3d Cir. 2005) (quoting *Johnson*, 302 F.3d at 150). A court must grant a new trial if it concludes that the trial was beset by cumulative errors that so infected the jury's deliberations that they substantially influenced the trial's outcome. *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994).

## II.    DISCUSSION

### A.    Kaplan's Motion

#### 1.    *Improper Opinion Testimony*

Both Defendants argue that they were irreparably prejudiced by certain testimony offered by Troopers Joseph Thompson, Michael Skahill, and Sean Regan.  Specifically, Defendants argue that the testimony of these Troopers "repeatedly – both explicitly and implicitly – signaled to the jury their beliefs that [Defendants were] guilty, and otherwise expressed opinions regarding the credibility of witnesses . . . ."  (Mem. of Law in Supp. of Def. Kaplan's Mot. for a New Trial [Kaplan Mem.] at 2; Post-Trial Mot. of Def. Mason for a New Trial, Acquittal [Mason Mot.] ¶ 9.)

#### a.    *Trooper Thompson*

Trooper Thompson was responsible for executing a warrant at 122 West Wyneva Street, a property which the warrant avers was owned, occupied, or possessed by Kaplan.  Kaplan takes issue with the following testimony from Trooper Thompson:

|               |                                                          |
| ------------- | -------------------------------------------------------- |
| Thompson:     | I encountered Mr. Kaplan on the corner of Wayne and Wyneva.  I was told over the radio that he was on that corner. |
|               | Myself and Trooper Todd Harris approached Mr. Kaplan and arrested him without incident at that location. |
| Government :  | Were there other people in the area?                     |
| Thompson:     | Yeah, a lot of people were out on the street, people started coming [out] of their houses, and at that point, Mr. Kaplan started to tell people, you know, to call his |

> peeps, to call his peeps is the words that he used.
>
> With that being said, I know that he lives down at the
>
> end of the block, and at one-

(Apr. 8, 2010 Tr. at 111.) At that point, the Court sustained Kaplan's counsel's objection "to what he knows [about] where he lives." (*Id.*) Kaplan argues that it was improper for Trooper Thompson to testify as to his belief that Kaplan lives on Wyneva Street. A search of that location revealed evidence of drug dealing, including scales, baggies, cash, and other indicia of drug activity. The Government tried to connect Kaplan to that drug activity by arguing that he owned and often stayed at the home. Kaplan throughout trial attempted to distance himself from the home and thereby raise doubts that the evidence found there belonged to him.

The Government contends that based on Counsel's objection, the jury did not hear improper testimony from Trooper Thompson regarding whether Kaplan lived at 122 West Wyneva Street. (Gov't's Resp. to Defs.' Mots. for a New Trial [Gov't's Resp.] at 27.) Furthermore, the Government argues that the testimony was nothing more than a method to "explain a logical sequence of events. . . . After all, the only conceivable reason for the police to have sought and obtained a court order to search 122 Wyneva was because it was associated with Kaplan and his illegal activities there." *Id.*

Although Trooper Thompson said that he knew Kaplan lived on Wyneva Street, the Court agrees that taken in context, his statement did not prejudice Kaplan. Despite repeated efforts on the part of Counsel to keep from the jury any testimony or evidence that tied Kaplan to the Wyneva Street residence, much of that evidence was properly admitted. Trooper Thompson went to that location because he believed that Kaplan lived there or at least had ready access to it and that

4

evidence of drug dealing would be found there. Of course, the jury was free to disbelieve Kaplan's connection to the residence. But it would have been obvious to a jury that Trooper Thompson went to execute a search warrant at 122 West Wyneva Street because he believed Kaplan lived there and had evidence of his drug trade there. Trooper Thompson's explicit statement to that effect did not prejudice the jury. As the Government contends, Kaplan's objection was sustained, thus signaling to the jury that it should disregard Trooper Thompson's testimony regarding his belief that Kaplan lived at 122 West Wyneva Street.

Kaplan attempted to advance the argument that the drug related evidence belonged to Deward Ray, the man who paid rent to Kaplan and who was present when Trooper Thompson began his search of the property. (Kaplan Mem. at 4.) He contends that Trooper Thompson continued to improperly offer his opinion that the drugs and contraband found at 122 West Wyneva Street belonged to Kaplan and not Deward Ray. Trooper Thompson's report regarding his execution of the search warrant states that Ray originally told Thompson that money in the house belonged to Kaplan but later stated that although Kaplan could come and go as he pleased, any items in the home belonged to Ray. (Thompson's Report.) According to Kaplan, Trooper Thompson's misconduct continued on cross-examination as Thompson "responded to various questions by making certain the jury knew that he believed that the items belong to Kaplan." (*Id*. at 5.) For example:

> Defense counsel: You come to learn that this individual lives in this property; am I right about that, sir?
>
> Thompson: I – I come to learn that he tells me that he lives – there.
>
> Defense counsel: He, in fact, tells you that he rents that

|  |  |
|---|---|
|  | property; am I right about that, sir? |
| Thompson: | That is correct. |
| Defense counsel: | He tells you he rents that property from Mr. Kaplan; am I right about that, sir? |
| Thompson: | Yes, he did. |
| Defense counsel: | And you have no reason to believe, sir, this person lives anywhere else other than that property, do you, sir? |
| Thompson: | Are you asking my opinion, sir, or? |
| Defense counsel: | No, I'm asking you, sir, do you have any facts to show another address for this individual? |
| Thompson: | No, I do not, at that time. |
| Defense counsel: | And you had no indication, sir, that you ever saw him at any other location, other than this location; am I right about that, sir? |
| Thompson: | That is correct. |
| Defense counsel: | So to the best of your knowledge and ability, sir, from that actual facts, this person tells you he lives there; am I right about that, sir? |
| Thompson: | That is correct. |

(Apr. 9, 2010 Tr. at 28-29.)  Kaplan also cites the following purportedly improper testimony:

| Defense counsel: | We can agree then, sir, that you have absolutely no |
|---|---|

|  |  |
|---|---|
|  | knowledge of anything today, personal knowledge, connecting Mr. Kaplan to that box, do you sir? |
| Thompson: | Not the way you're saying. We did a year-long investigation and – |
| Defense counsel: | I'm asking you, sir, whether you have any knowledge, actual knowledge connecting Mr. Kaplan to that box? Simple as that. |
| Thompson: | Other than our investigation? |

(*Id*. at 42-43.)

Counsel opened the door here when he asked Trooper Thompson if he had actual knowledge about Kaplan's connection to a Timberland shoe box that contained evidence of drugs and proof that Kaplan resided at 122 West Wyneva Street. Thompson answered the question in an appropriate manner. Furthermore, there was overwhelming testimony connecting Kaplan to 122 West Wyneva, such that this exchange is not of a degree that would have affected the fairness of the trial.

>        *b.*        *Troopers Skahill and Regan*

According to Kaplan, Trooper Skahill also improperly offered his opinion about the merits of the case during the following exchange:

| Defense counsel: | Right. When you arrested Don Johnson, Don Johnson spoke with you; am I right? |
|---|---|
| Skahill: | No, he did not, sir. |
| Defense counsel: | Didn't he make a statement? |
| Skahill: | Not to me, sir. |

7

| Defense counsel: | He made it to law enforcement, didn't he? |
| Skahill: | He did, sir. |
| Defense counsel: | He said he got the drugs from Malik Sullivan, didn't he? |
| Skahill: | Yes, he lied about it. |

(Apr. 9, 2010 Tr. at 174.)

Kaplan also contends that Trooper Regan impermissibly offered his opinion when, during his testimony about a controlled buy he orchestrated between Donald Johnson and Malik Sullivan, Regan said that Sullivan was "specifically going to buy cocaine that we believed was coming from Edward Kaplan to Donald Johnson." (Apr. 14, 2010 Tr. at 40.)

This testimony from Troopers Skahill, and Regan does not warrant a new trial. First, the Court properly dealt with this issue as it arose during the trial. Counsel did not raise any objection to Regan's statement, thus depriving the Court of an opportunity to rule on the appropriateness of Regan's statements when they were made, or to give appropriate instructions to the jury at the time. As for Trooper Skahill, the Court ruled on Counsel's objection by stating, "[h]e asked you whether he made a statement. He didn't ask you what the statement was . . . [s]o the jury will disregard that comment about what was said." (Apr. 9, 2010 Tr. at 174-75.) Furthermore, although Trooper Skahill should not have made the statement, it should have come as no surprise to the jury that the Government agent who believed Kaplan was running a major drug ring did not trust Johnson's original statement that Sullivan provided him drugs.

Second, the Court issued the following curative instruction to the jury after all of the evidence was submitted:

You heard testimony from Trooper Thompson, Trooper Skahill, and FBI Agent Regan. I want to give you a special instruction with respect to those witnesses. Each of those witnesses attempted to place before you their opinions about who was truthful and who was not. This was improper and I instructed you earlier to disregard such testimony. I have admonished these witnesses that their testimony in this regard was wrong and I instruct you that you must disregard their testimony with regard to those opinions.

(Court's Charge.). The Court also instructed the jury that the testimony of law enforcement officials was not entitled to any more or less weight simply because it came from a law enforcement officer. The Court further instructed the jury that attorneys for Defendant could attack the credibility of a law enforcement officer because his testimony could be colored by a personal or professional interest in the outcome of the case.

In his supplemental briefing, Kaplan argues that Skahill also improperly explained the requirements for probable cause when he stated:

A lot is involved. It's a very intrusive – you're tapping into somebody's life, and you're going to listen to all their telephone conversations. Therefore, the courts have deemed, in the state of Pennsylvania, that you're going to have to prove – establish very good probable cause, and you have to take it to a very high court. It's a court above your Common Pleas, your county courts, it's the court above that, the Superior Court of Pennsylvania.

(Apr. 9, 2010 Tr. at 132.) He further testified that law enforcement agents went to the same Superior Court judge to approve certain warrants and that the judge was "very familiar with the participants." (*Id*. at 221.) The Court sustained an objection to the latter testimony. Over the course of the trial, Trooper Skahill's brief testimony about applying for a search warrant did not prejudice Kaplan.

Kaplan cites a number of cases that stand for the propositions that: (1) a witness may not give a direct opinion of a defendant's guilt or innocence; (2) a government agent may not indicate a personal belief in the credibility of a witness; and (3) a government agent may not bolster the

9

credibility of a witness by implying the government agent knows of corroborating evidence of which the jury is unaware. (Kaplan Mem. at 11-12.) While Kaplan is correct as a matter of law that a government witness may not improperly bolster or vouch for the testimony of another witness, he fails to note that none of the cases he cites granted the defendant a new trial as a result of improper vouching or bolstering. *See United States v. Rosario-Diaz*, 202 F.3d 54, 65 (1st Cir. 2000) (holding that although government agent was guilty of improper bolstering, admission of the testimony was harmless error and did not warrant reversal); *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997) (statements by government lawyer that prosecution moved DEA report into evidence because it had nothing to hide were not improper vouching nor did it unfairly prejudice defendant); *United States v. Zehrbach*, 47 F.3d 1252, 1265-67 (3d Cir. 1995) (finding prosecutor's remarks regarding his personal beliefs constituted harmless error and judge issued statement to jury to disregard statements); *United States v. Lewis*, 10 F.3d 1086 (4th Cir. 1993) ("[A] prosecutor's solicitation of assertions of trustworthiness from government witnesses may also be impermissible vouching. That did not take place in this case."). Indeed, in one case of improper vouching, the court concluded that any prejudice was eliminated or reduced to harmless error by the trial judge's curative instruction. *United States v. Piva*, 870 F.2d 753, 760-61 (1st Cir. 1989). In Kaplan's supplemental memorandum, he directs this Court to two Third Circuit cases to support his assertion that a police officer may not testify about the veracity of a witness. But one case, *Lam v. Kelchner*, 304 F.3d 256 (3d Cir. 2002), rejected a habeas petition arguing that improper vouching created unfair prejudice that deprived the defendant of a fair trial. *Id*. at 271-72. The other case Defendant cites, *United States v. Vitillo*, 490 F.3d 314 (3d Cir. 2007) concluded that a prosecutor's improper vouching was harmless error given the strong evidence of the defendant's guilt and the trial court's instruction that

the jury was the sole judge of the facts and credibility of the witnesses and that a lawyer's statements were not evidence. *Id*. at 329. In fact, *Vitillo* noted that vouching aimed at a witness's credibility and based on extra-record evidence constituted non-constitutional error. *Id*.

The Court will not grant a new trial based on improper opinion testimony.

### 2. Fourth Amendment's Particularity Requirement

Defendants argue that this Court erred when it failed to grant Kaplan's motion to suppress certain evidence *nunc pro tunc* based on testimony from Trooper Thompson suggesting "that officers had become aware that the building at 122 West Wyneva Street was a multi-unit building, rather than a single-occupancy building, hours *before* the search warrant was issued, but did not disclose that key fact to the issuing authority." (Kaplan's Supplemental Mem. in Supp. of Mot. for a New Trial at 5.)

Before trial, Kaplan moved to suppress evidence stemming from the search of 122 West Wyneva Street, arguing that the search was not supported by probable cause. This motion did not challenge the particularity of the warrant. The Court denied the motion on November 13, 2009. At trial following certain testimony from Trooper Thompson, Kaplan's lawyer announced that the warrant for 122 West Wyneva Street was invalid because it failed to state with particularity the place to be searched. Kaplan's lawyer asked for a mistrial. The parties briefed the issue and the Court allowed oral argument on the motion. The Government argued that Kaplan's motion was late and should therefore be denied. The Court denied Kaplan's motion from the bench, ruling that it lacked merit. The Court did not address the Government's tardiness contention. The Court concluded that it would not retroactively invalidate the warrant because 122 West Wyneva Street was not a multi-unit dwelling and that regardless of the status of that location, "the search under the warrant

reasonably included only common areas and those places Kaplan used. . . . At the time the warrant was issued, it was reasonable to believe that drugs would be found anywhere on the premises, including the kitchen and the basement."  (Apr. 9, 2010 Tr. at 18.)

Having considered Defendants' arguments, the Court concludes that the Defendants waived the particularity issue by failing to alert the Court to the issue until the trial was underway.  The Court also concludes that the argument lacks merit.

### a. Timeliness of the motion to suppress

Rule 12(b) of the Federal Rules of Criminal Procedure provides that a motion to suppress evidence "must be raised before trial."  FED. R. CRIM. P. 12(b)(3)(C).  Rule 12 also provides that a court may set a deadline for pretrial motions and that "[a] party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides.  For good cause, the court may grant relief from the waiver."  FED. R. CRIM. P. 12(e).

Rule 12 explicitly requires a defendant to move to suppress evidence prior to trial; the failure to do so is a waiver.  *United States v. Rose*, 538 F.3d 175, 178, 182-83 (3d Cir. 2008).  Furthermore, it is not enough that a defendant advance any argument in favor of suppression – rather, those theories for suppression not raised will be deemed waived.  *Cf. United States v. Lockett*, 406 F.3d 207, 212 (3d Cir. 2005) ("Therefore, in the context of a motion to suppress, a defendant must have advanced substantially the same theories of suppression in the district court as he or she seeks to rely on in [the appellate court]."); *see also Rose*, 538 F.3d at 180, 182 (holding that failure to assert a particular ground for suppression constitutes a waiver of argument).

Allowing a defendant to first raise an argument in favor of suppression after the trial has

commenced would greatly prejudice the government. The government may appeal an adverse ruling on a suppression motion provided jeopardy has not yet attached. *United States v. Chavez-Valencia*, 116 F.3d 127, 132 (5th Cir. 1997). Jeopardy attaches once the jury is sworn. *Rose*, 538 F.3d at 182. In this case, if Kaplan is allowed to advance his particularity argument and were to succeed on it, the Government would be left with no recourse. *See id*. ("[A]llowing a defendant to raise a suppression motion after jeopardy has attached (*i.e.*, after the jury has been sworn) robs the Government of its ability to appeal an adverse ruling on the suppression issue."); *see also* 18 U.S.C. § 3731. Such an outcome would invite defense attorneys to squirrel away suppression arguments only to unleash them during the trial or on appeal.

Originally, pretrial motions were due on January 8, 2007. The Court granted Kaplan's request for a continuance until February 16, 2007 to file pretrial motions. The trial was continued and the Court granted another continuance that allowed Kaplan to file pretrial motions no later than "thirty days after the supporting affidavits of probable cause are forwarded to defendant's counsel." Order granting extension, *United States v. Kaplan*, Crim. A. No. 06-719 (E.D. Pa. Feb. 14, 2007), ECF No. 24. The Court granted another motion for continuance and set a due date of November 26, 2007 for pretrial motions. Order granting extension, *United States v. Kaplan*, Crim. A. No. 06-719 (E.D. Pa. Oct. 2, 2007), ECF No. 63. The deadline was again extended and Kaplan's pretrial motions were to be filed by January 21, 2008. Order granting extension, *United States v. Kaplan*, Crim. A. No. 06-719 (E.D. Pa. Nov. 27, 2007), ECF No. 67. On January 17, 2008, Kaplan filed an extensive motion to suppress. The motion attacked the November 22, 2006 search warrant of Kaplan's 122 West Wyneva Street property. Kaplan argued, *inter alia*, that the approved wiretaps lacked probable cause and the search warrant of 122 West Wyneva Street was not supported by facts

from which a neutral judicial officer could have found probable cause to believe that evidence of illegal activity would be found at the residence. The Court conducted a hearing on the motion to suppress on April 30, 2009 but was required to continue the matter when a new procedural issue – not relevant to this motion – arose. The Court permitted additional briefing related to the motion to suppress. On October 15, 2009, the Court held a hearing on Kaplan's motion to suppress; witnesses were presented and counsel were permitted to make extensive oral argument in support of their positions. Finally, the Court allowed the parties to file additional briefing on the motion to suppress. Kaplan filed proposed findings of fact and conclusions of law. On November 13, 2009, the Court issued a lengthy opinion rejecting Kaplan's arguments and finding that the November 22, 2006 search warrant of the 122 West Wyneva Street property was based on probable cause.

From the time the search warrant was issued to the time that the Court denied the motion to suppress, nearly three years had passed. The Court had granted numerous extensions to the pretrial motion deadline. Hundreds of pages of legal briefing and countless attorney hours were devoted to the motions to suppress. The Court allowed all parties ample time and paper to make their arguments. Nowhere along this extensive procedural road did Kaplan suggest that the search warrant for 122 West Wyneva Street violated the Fourth Amendment's particularity requirement. It was only when Trooper Thompson took the stand that Counsel attempted to lay the groundwork for his particularity argument. Counsel now argues that it was not until Trooper Thompson testified that it became apparent that he became aware of the multi-unit nature of the building well before the warrant was signed. This argument is not persuasive because Trooper Thompson's report states that three individuals returned to the property "[w]hile waiting on the search warrant." Furthermore, counsel could have requested the consent forms of the persons who entered the property while

14

Trooper Thompson waited for the warrant to confirm the timing of events on that evening. The Court rejects the theory that it was not until Trooper Thompson took the stand that the particularity of the warrant became an issue.

The motion to suppress based on the Fourth Amendment's particularity requirement was long overdue and the argument in support thereof was therefore waived. Counsel had years to review the warrant and the property searched to formulate this argument. Indeed, Counsel stated that he had visited the property and therefore he had ample time prior to trial to file a suppression motion arguing lack of particularity. (Apr. 8, 2010 Tr. at 155.) He filed extensive briefing attacking the 122 West Wyneva Street warrant yet did not make this argument until the trial was well underway. His decision to keep this argument in his back pocket was a trial strategy that placed this Court in the difficult position of halting the trial to allow briefing and oral argument on an issue that could have been raised years ago. The Court also finds that no good cause exists for the failure to raise the issue of the warrant's particularity. The issue was waived.[1]

### b. Merits of the Particularity Argument

The Fourth Amendment requires that search warrants be issued only upon probable cause, that they be supported by oath or affirmation and that they particularly describe the place to be searched, and the persons or things to be seized. U.S. CONST. amend. IV.

The Supreme Court considered the Fourth Amendment's "particularity requirement" in

---

[1] Kaplan suggests that the Court "allowed" Kaplan's motion to suppress *nunc pro tunc* pursuant to Rule 12(e) of the Federal Rules of Criminal Procedure, which permits a Court to grant relief from a waiver "[f]or good cause." (Kaplan's Supplemental Mem. in Supp. of Mot. for a New Trial at 5.) This is not accurate. Although the Court, during the trial, addressed the merits of Kaplan's motion to suppress, the Court did not expressly excuse the waiver and, finding no valid reasons for the late motion, refuses to do so here. Courts do not waive arguments, litigants do.

*Maryland v. Garrison*, 480 U.S. 79 (1987).  In *Garrison*, police officers obtained a warrant to search Lawrence McWebb and "the premises known as 2036 Park Avenue third floor apartment."  *Id*. at 80.  The officer who obtained the warrant reasonably concluded that there was a single apartment on the third floor and that it belonged to McWebb.  The officers who executed the warrant discovered evidence of illegal activity in Garrison's apartment but they did so before they discovered that the third floor had two apartments.  *Id*. at 81.  Once they learned that fact, they discontinued the search.  *Id*.  The issue presented to the Supreme Court was whether the fact that hindsight revealed that the warrant was broader than it should have been rendered the warrant invalid.  The Court noted that if the officers should have known that the third floor contained two separate dwellings, the officers would have been required to exclude Garrison's apartment from the scope of the requested warrant.  *Id*. at 85.  However, the Court held that the warrant was valid when issued because "the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant."  *Id*. at 85-86.  The Court then addressed whether the execution of the warrant was reasonable.  If the officers were aware, or should have been aware, that the third floor contained two apartments before they entered Garrison's apartment, they had a duty to limit their search to McWebb's living quarters.  *Id*. at 86-87.  Moreover, the officers were required to stop their search of Garrison's apartment once they learned there were multiple units and that they might be in a unit erroneously included in the warrant.  *Id*. at 87.  Because the objective facts available to the officers when they executed the warrant suggested no distinction between McWebb's apartment and Garrison's, the execution of the warrant was reasonable.  *Id*. at 88.

Kaplan also cites to *United States v. Ritter*, 416 F.3d 256 (3d Cir. 2005).  In *Ritter*, the police received a warrant that permitted them to search "No known number New Street Frederiksted St.

Croix U.S.V.I. further pictured on Attachment 'A'." *Id*. at 259. While executing the warrant, officers realized that the property's main structure actually consisted of at least four separate apartments. *Id*. at 260. Despite this discovery, the police continued to search the premises and collect evidence. *Id*. The Court in *Ritter* court applied the holding in *Garrison* to overturn the lower court's decision that the officer's discovery of multiple units within the residence invalidated the warrant. *Id*. at 266. The court made clear that a warrant is not invalid when issued if it reasonably described the structure to be searched even if it later turned out to be ambiguous in scope. *Id*. (citing *Garrison*, 480 U.S. at 86).

Here, the Court has no reason to believe that the warrant failed to meet the particularity requirement at the time it was issued and thus Trooper Thompson's knowledge would not retroactively invalidate a valid warrant. *Garrison*, 480 U.S. at 85 ("[T]he discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant. The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate."). At the time Troopers Regan and Skahill applied for the warrant, they had no reason to believe that 122 West Wyneva Street was a multi-unit dwelling. The warrant states the address to be searched and describes the property as "the left half of a 'twin style' residential building. The number '122' is printed above the front entry door. . . . It has white trim on the lower half of the building and gray simulated stone facing and trim on the upper half. When viewed from the front, facing the residence, there is a front porch that is faced with gray stonework on the front." The Court concludes that the warrant for 122 West Wyneva Street adequately describes the place to be searched and was valid when issued. Thus, the officers who sought the warrant reasonably believed that they adequately

described the place to be searched. Trooper Thompson's knowledge does not alter that fact.

Kaplan also argues that the search exceeded the scope of the warrant. The search warrant is dated November 21, 2006. At 9:00 pm on November 20, 2006, Trooper Thompson was engaged in undercover surveillance searching for Kaplan. About half an hour later, he was informed that Kaplan was spotted standing with another African-American male at the corner of Wayne and Wyneva Streets. Thompson and Corporal Todd Harris approached Kaplan; Kaplan "started telling people that were watching his arrest to call his peoples." (Thompson report.) Thompson and several others headed to 122 West Wyneva Street where he believed Kaplan lived. While he parked in front of the house, Thompson noticed that a downstairs light was on and the basement was also lit. He also saw movement in the house. He and Trooper John Scott went to the front door and knocked and an African-American male opened the door. The male was temporarily handcuffed while Thompson secured the area. The male, who identified himself as Ray Johnson, was then uncuffed. "Johnson" produced a Pennsylvania driver's license and told Thompson that he lived in the house and rented from Pooh, whose real name "Johnson" did not know.

"Johnson" and Thompson "made small talk" while Thompson waited for a search warrant. (*Id*.) While awaiting the warrant, Thompson learned that "Johnson" was really Deward Garnet Ray. Once the warrant was signed, Ray informed Thompson that cocaine and money were in the house. Ray walked Thompson into the kitchen and pointed to a black bag which contained three plastic bags of suspected cocaine, three digital scales, and three empty sandwich bags. During their search of the kitchen, officers also discovered currency wrapped in a rubber band. Although Ray initially denied that the money was his, he eventually stated that "I guess whatever you find in here is mine." Thompson asked Ray if Pooh lived there and Ray responded, "well it's his place, I rent from him and

18

he can come and go as he pleases I guess." (*Id.*) The search of the kitchen uncovered mail addressed to Kaplan as well as photos of Kaplan. Also in the kitchen was a Timberland box containing a photo of Kaplan, numerous documents addressed to him, and approximately nine ounces of cocaine.

Trooper Thompson also went around to the back of house – in the backyard was a door leading to the basement. He saw two German Shepherds, which Ray reported belonged to Pooh. Thompson went down to the basement and found a laundry basket with a pair of blue jeans. Inside the pocket of the blue jeans was approximately three ounces of suspected cocaine or a cutting agent. Thompson also found mail "with a date very close to the actual date," $1000, and documents addressed to Kaplan in a night stand. (*Id.*) Next to the night stand he found a Timberland box with an empty plastic bag containing suspected cocaine residue as well as other documents to Kaplan. In the back room of the basement, officers found additional documents addressed to Kaplan.

While waiting for the search warrant, three people returned to the residence through the front door. All of them stated that they rented a room from a man named Pooh. All three individuals consented to searches of their rooms but nothing of evidentiary value was uncovered.

After Kaplan's lawyer completed his cross-examination of Trooper Thompson, he argued to the Court that it was only after his questioning that it was revealed that Thompson knew that he was in a multi-unit building before he searched 122 West Wyneva Street pursuant to the warrant. (Apr. 8, 2010 Tr. at 147.) According to Kaplan, before the search warrant was issued at 2:10 AM, Trooper Thompson was aware that he was in a multi-unit building, and therefore could not rely on the warrant, which he knew was insufficiently particular. (*Id.* at 150.)

The Court believes Trooper Thompson acted reasonably and that he was not confronted with a multi-unit building. *See Durham v. McElynn*, 254 F. App'x 892, 896 (3d Cir. 2007) ("While

19

[Appellant] may have had a roommate, this does not convert his single-family home into an apartment house or multi-unit building."); *see also United States v. Schwinn*, App. A. No. 08-14592, 2010 WL 1711064, at *6 (11th Cir. 2010) ("That a dwelling might be shared with others is not, by itself, enough to require officers to exclude portions of that dwelling from the warrant's scope: probable cause often exists to search the entire dwelling because it is reasonable to assume that the suspect has access to the entire dwelling.").

Kaplan's lawyer tries to make it appear certain that Trooper Thompson discovered he was in a multi-unit building prior to executing the search. But Trooper Thompson repeatedly states that he cannot recall the exact time frame in which people entered the house relative to when he commenced the search. (Apr. 8, 2010 Tr. at 145-46.)

Trooper Thompson's report, however, raises the possibility that he was in a multi-unit dwelling. It states that "[w]hile waiting on the search warrant numerous people returned to the residence through the front door." Trooper Thompson then obtained consent to search from three persons claiming to rent from Kaplan. But even if this was a multi-unit dwelling and even if Trooper Thompson was aware of that prior to executing the search warrant, the evidence seized would not be subject to suppression. There is no evidence that the officers swearing out the search warrant were aware that Kaplan had borders at 122 West Wyneva Street. Accordingly, even if this were a multi-unit dwelling, Trooper Thompson was still entitled to rely on the warrant to search areas clearly covered by the warrant. *See Ritter*, 416 F.3d at 266 (noting that once officers knew or should have known that search warrant did not properly label building as multi-unit dwelling, "they were obligated to either limit the search to those areas clearly covered by the warrant or to discontinue entirely their search"). A number of items recovered pursuant to the search warrant were found in

the kitchen, a common area to which all residents of the home had access and which was therefore covered by the warrant. *Id.* ("[M]ere entry into the building's common areas was reasonable and lawful because the officers carried a valid warrant authorizing entry upon the premises.") Because Trooper Thompson had a valid warrant authorizing entry into 122 West Wyneva Street, the search of common areas, such as the kitchen, was not improper. *See id.* at 266-67; *see also United States v. Acosta*, 965 F.2d 1248, 1252 (3d Cir. 1992) (finding that there is no reasonable expectation of privacy in common areas of apartment-building). Trooper Thompson, if he learned that the warrant authorized a search broader than warranted by probable cause, was obligated to "either limit the search to those areas clearly covered by the warrant or to discontinue entirely [the] search." *Ritter*, 416 F.3d at 266; *see also United States v. Brooks*, 294 F. App'x 71, 74 (4th Cir. 2008) (refusing to suppress evidence based on overbroad warrant because police focused search on first floor where defendant lived). Here, officers obtained a warrant for Edward Kaplan's residence at 122 West Wyneva Street and based on the information Thompson learned while at the residence, officers searched common areas and rooms, including the basement, that officers reasonably believed Kaplan controlled. The warrant specifically listed Kaplan as the owner, occupier, or possessor of the property and hence authorized a search of those areas over which Kaplan had control or access. Additionally, Thompson was told that it was Kaplan's place and that Kaplan could come and go as he pleased. Thompson was also originally told that $2654.00 in bundled currency found at the property belonged to Kaplan. Any subsequent knowledge Thompson may have acquired about the property does not render impermissible Thompson's search over those areas Kaplan could access.

Finally, Kaplan's argument places form over substance. Even if the warrant lacked particularity, Trooper Thompson sought and obtained consent from those individuals who would

have been aggrieved by such a warrant. Thus, a warrant limited to those areas Kaplan controlled would have permitted Trooper Thompson to search those areas where he subsequently found incriminating evidence.

## B.    Mason's Motion

Mason argues that the Court erred in denying his pre-trial motion to suppress the wiretaps and the physical evidence seized after the minivan he was driving was stopped. The Court addressed Mason's motion to suppress in a Memorandum dated November 13, 2009. Nothing material has changed since then and the Court adheres to its prior analysis on these issues.

Mason also contends that the Court erred when it allowed wiretaps to be played and transcripts to be displayed without authentication and without identifying Mason's voice. This argument is without merit for two reasons. First, the issue was waived. The Government filed a *Starks* motion on February 25, 2010. The Government sought an order from this Court that the wiretaps it sought to introduce during trial were authentic and correct, that the recordings were properly preserved, that the speakers on the electronic recordings were properly identified and that the transcripts of the electronic recordings accurately represented the conversations on the electronic recordings and accurately identified the speakers and parties to those recorded conversations. The Court raised the issue with Counsel during the trial and subsequently denied the motion as moot because Counsel assured the Court that the matter was settled. (Apr. 8, 2010 Tr. at 2.) Conversations were therefore played at numerous points during the trial to the jury and no objections were made. Mason cannot remain silent as to authenticity at trial only to challenge it after he has been convicted. Second, Mason's voice was properly identified and authenticated. Numerous witnesses testified as to conversations they had with Mason. They were able to identify the voice

they were talking to as belonging to Mason.  "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  FED. R. EVID. 901(a).  By way of illustration, a witness may authenticate a voice by offering his opinion as to the speaker "based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."  *Id*. 901(b)(5).  With respect to the transcripts, the Court instructed the jury as follows:

> You have heard audio and video recordings that were received in evidence, and you were shown written transcripts of the recordings.
>
> Keep in mind that the transcripts are not evidence.  They were shown to you only as a guide to help you follow what was being said.  The recordings themselves are the evidence.  If you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read.  And if you could not hear or understand certain parts of the recordings you must ignore the transcripts as far as those parts are concerned.
>
> The transcripts name the speakers.  But remember, you must decide who you actually heard speaking in the recording.  The names on the transcript were used simply for your convenience.

(Court's Charge.)  The Court made clear that the transcripts were not evidence and if the jury was unable to hear certain parts of the audio recordings, they were to ignore those parts of the transcript.  The Court discerns no prejudice to Mason by allowing the jury to view a transcription while listening to a recording.

Mason next objects that the Government "attempted to place the lack of tax returns in front of the jury despite the fact that Mason was employed and despite the fact that Mason did file tax returns."  (Mason Supplemental Post-Trial Mot. for a New Trial/Acquittal ¶ 18.)  The Court rejected the Government's attempt to place before the jury evidence that Defendants failed to file tax returns.  Thus, Mason has no valid argument on this issue because no evidence of the filing of tax returns was

put before the jury.

Mason further claims that the Government's evidence was insufficient to prove that the substance found in the minivan he was driving was cocaine. (*Id.* ¶ 15(b).) Although Mason originally stipulated to the results of chemical testing showing the presence of cocaine and the Government read those stipulations to the jury, Mason later expressed unease with those stipulations. (Apr. 13, 2010 Tr. at 9-13.) As a result, and out of an abundance of caution, the Government called three forensic chemists from the Pennsylvania State Police Regional Laboratory to review their reports and testify as to their findings. (Apr. 14, 2010 Tr. at 3-19.) They also testified that the various materials they tested contained cocaine. All three were qualified as experts in their fields. The jury was free to believe their testimony and Mason's objection is thus rejected.

Next, Mason also claims that the evidence adduced against him was insufficient to sustain the jury's verdict. Specifically, he complains that the only evidence against him came from cooperating co-defendants and was not sufficiently corroborated. The jury heard witnesses testify that Mason provided them drugs. They also heard wiretaps from which a reasonable jury could have concluded that Mason was involved in a drug conspiracy. Finally, Mason was pulled over while driving a minivan that contained drugs. Thus, it is not true that the Government's case against Mason was based solely on uncorroborated testimony from co-defendants. His sufficiency of the evidence argument is thus unpersuasive.

Mason further claims that he was prejudiced when the Government failed to present his counsel with information about Malik Sullivan, who illegally sold drugs while also cooperating with the Government by participating in controlled purchases. But, as the Government notes, Sullivan's "double dealing" was relevant because Kaplan theorized that it was Sullivan – not Kaplan – who

sold Donald Johnson cocaine on November 20, 2006. Mason fails to explain how this information applies to Mason. Furthermore, the Government provided this information to Counsel and it was addressed during the trial.[2]

Finally, the Court rejects Mason's claim that the Government improperly pursued a count in the indictment for which it lacked evidence to prove beyond a reasonable doubt. The Court, upon oral motion of Mason's lawyer, dismissed Count III of the Government's indictment. Thus, Mason has no claim on this point. To the extent Mason argues that he was prejudiced because the Court permitted evidence to be presented that was relevant to a later dismissed charge, this claim is also unavailing. If a defendant is convicted of multiple counts and the conviction as to one count is subsequently overturned, "prejudicial spillover" is possible "only if the evidence introduced to support the reversed count would have been inadmissible at a trial on the remaining count." *United States v. Cross*, 308 F.3d 308, 317 (3d Cir. 2002). That is not the case here, however, as evidence related to the dismissed count was admissible to show Mason's connection to the drug conspiracy outlined in another count. *See id*. at 318.

III.    **CONCLUSION**

For the above stated reasons, the Court denies, in their entirety, the post-trial motions of Kaplan and Mason. An Order consistent with this Memorandum will be docketed separately.

---

[2] During oral argument on Defendants' post-trial motions, Kaplan's lawyer raised the prospect of a *Brady* violation when he argued that the Government failed to reveal the depths of Sullivan's double dealing. Because Counsel was able to argue to the jury that Sullivan was double dealing, any additional evidence is a matter of degree that does not warrant a new trial.